**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 22-CV-1000

**R2 Medical Clinic, P.C., a Colorado Professional Corporation,**

    Plaintiff,

v.

**Daniel Lann, M.D., an Individual,**
**Denver Stretch Institute, Inc. d/b/a Denver Sports Recovery, a Colorado Corporation,**
**Katie McConnell, an Individual, David Raday, Jr., an Individual, Optimization Clinics, LLC, a Colorado Limited Liability Corporation and**

**Does 1 through 10,**

    Defendants.

---

**MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

---

R2 Medical Clinic, P.C. ("R2" or "Plaintiff"), by and through its attorneys, hereby respectfully moves for an ex parte Temporary Restraining Order and Preliminary and Permanent Injunctive Relief, pursuant to Fed. R. Civ. P. 65, enjoining Defendants Daniel Lann, M.D. ("Lann"), Denver Stretch Institute, Inc. d/b/a Denver Sports Recovery ("DSR"), David Raday ("Raday"), Optimizations Clinics, LLC,[1] Katie McConnell ("McConnell"), and Does 1 through 10 (collectively "Defendants"), from misappropriating R2's confidential information to damage R2's

---

[1] Optimization Clinics, LLC, is a corporation owned and operated by Raday that conducted business with R2. Any reference to Raday shall also be a reference to Optimization Clinics, LLC.

1

good will and good name for the purpose of unlawfully poaching R2's customers. In support of this Motion, R2 states as follows:

## I. INTRODUCTION

In January 2022, R2 was a thriving medical practice focusing on health optimization and anti-aging, with four clinics spanning from Denver to Greeley. At that time, R2 was experiencing heightened success – increasing revenue at some locations and providing valued healthcare services to its many patients. R2 has spent significant money and resources to get the clinics to this point – by using its resources to market itself to new patients, to build strong relationships between patients and providers that has fostered a general trust and reputation in the community, and to invest in software systems to store confidential patient information that assists with carrying out the four clinics' day-to-day operations.

On April 1, R2's business changed significantly at the hands of two R2 contractors Raday and McConnell, then R2's Medical Assistants/Patient Liaisons, when they met with R2's owner and doctor, Erik Natkin, D.O., and announced their resignation from R2. Raday advised Dr. Natkin that he was going to start his own clinic with his father and family friend, and that McConnell was coming with him. However, they did not tell Dr. Natkin that weeks before the April 1st meeting they had begun taking steps to use R2's confidential trade secret patient information to direct R2's patients to their new clinic. Throughout March, Raday and McConnell formulated and put into action a meticulous and brazen scheme that has led to immediate and irreparable harm to R2's goodwill and ultimately, its business.

Raday and McConnell intentionally did not schedule follow-up appointments with R2 patients in March 2022 for April 2022, how they previously scheduled patients and consistent

with R2's business model, which relies on frequent follow-up appointments with Medical Providers Dr. Natkin and R2's Nurse Practitioner for patients' progress to be monitored closely and make appropriate treatment modifications as Dr. Natkin sees fit.  In addition, most patients are scheduled for monthly medication pick ups and blood draws for labs.  During a course of treatment, most patients set an appointment every month. After Raday and McConnell left in early April, Dr. Natkin noticed that there had been no patient follow-up appointments set for the month of April for many of the patients at the Greeley and Arvada locations where Raday and McConnell worked.

It became clear that this was done intentionally by Defendants when Dr. Natkin called an R2 patient to set an April follow-up appointment, only to learn that the patient was leaving R2 permanently for Raday and McConnell's new clinic - DSR, Lann, and Does 1 through 10.

Defendants' conduct has resulted in direct and immediate irreparable harm to R2's good name and goodwill with its patients and there is no adequate remedy at law, given that Defendants have harmed and continue harm R2. Defendants unlawfully utilized and exceeded their access to R2's confidential and proprietary computer systems that contain R2's trade secret patient information. Defendants have and continue to solicit and poach R2 patients, and by continuing to use that patient information to divert R2's patients to DSR, Lann and/or Does 1 through 10, to work with Raday and McConnell.  During R2 contractual relationship, Raday dispensed medication to a R2 patient without any interaction with a Medical Provider and formal treatment plan for the patient and McConnell performed multiple therapeutic phlebotomies without any labs, patient intake forms, consent forms, or provider-patient discussion and both Raday's and McConnell's actions were done without doctor oversight

3

Defendants also conspired to restrict access to the R2 Greeley, Colorado clinic and McConnell refuses to provide Dr. Natkin the building's main door key and alarm access code to building, making it impossible for R2 to carry on business at that location and further damaging R2's reputation with its patients who cannot access the office for their continued medical treatment needs or to pick up medications at the clinic. Defendant's actions, if not restrained, will continue to cause R2 irreversible injury.

For these reasons as more fully set out below and in the Verified Complaint for Temporary Restraining Order ("TRO") and Preliminary and Permanent Injunctive Relief ("Verified Complaint" or "VC") the Court should issue an ex parte TRO against Defendants in the form of the proposed ex parte filed with this Motion.

## II.    R2 SEEKS AN EX PARTE TRO

The Court should issue a TRO without written or oral notice to Raday, McConnell, Lann, DSR and Does 1 through 10 because the facts of the Verified Complaint clearly show the immediate and irreparable injury R2 will suffer before Defendants can be heard in opposition, because Defendant(s) (1) intentionally disrupted R2's normal business operations by failing to schedule follow-up appointments; (2) have and continue to solicit and treat patients of R2; (3) possess and continue to utilize R2's confidential information and trade secrets to engage R2 patients; and (4) continue to restrict R2's access to the Greeley clinic.

Giving notice of the TRO and the time period it will take for service and to have the Court hear this case will allow Defendants more time to continue to damage R2's patient relationships by continuing to solicit R2's patients and utilize R2's confidential patient information to treat R2's

4

patients and for these reasons, R2 has not conferred with Defendant(s)[2] regarding the specific relief requested in this Motion, but seeks a TRO without notice to Defendants.

Defendants' scheme to prevent R2 from entering the Greeley clinic has already caused irreparable reputational damage to R2, which, in the instance that an R2 patient tries to access the Greely clinic, will be viewed as R2 closing the clinic without giving notice to its patients and further, if R2 needed to treat its' Greeley patients, it is unable to do so because R2 is obviously "locked-out" of that location due to Defendants' intentional conduct.

Defendants' actions have and continue to harm R2's goodwill and R2 fears that Defendants will take additional steps to damage R2's good will and patient relationships if notice of the TRO is given.

### III. FACTUAL BACKGROUND

R2 has four operating medical clinics – one in Denver, Greeley, Arvada, and Aurora. V.C. ¶4. R2 Medical Clinic is a Professional Corporation, incorporated in Colorado in 2020. R2, through Dr. Natkin, D.O., provides regeneration and rejuvenation treatments to optimize its patient's health – specifically through hormone therapies and anti-aging treatments. V.C. ¶ 4.

Lann is a licensed medical doctor affiliated with DSR and focuses on patients looking to better their health through hormone optimization, injections, and bioidentical therapies. Lann directly competes with R2 for patients due to the similar nature of both clinics. V.C. ¶ 5. DSR, through a team of providers, uses an integrated approach to restore function and improve physical performance for its patients. DSR employs Lann as one of its providers. V.C. ¶ 6.

---

[2] R2 sent a cease and desist letter to Rady, McConnell and Lann and Rady responded on behalf of those Defendants that they had not violated the law and that R2's letter was an attempt by R2 to "prevent us from assisting in the operation of a completing business" and claiming they were fairly competing with R2.

5

On or about the beginning of January 2021, R2 employed Raday and McConnell as Medical Assistants/Patient Liaisons. V.C. ¶ 7, 8. Does 1 through 10 upon information and belief, may serve as medical doctors or medical supervisors who work with Raday, McConnell and Lann. Does 1 through 10 provide medical care very similar to that which R2 provides meaning they both compete directly for patients. V.C. ¶ 10.

During their employment with R2, Raday and McConnell were Patient Liaisons and the primary contacts for R2's patients – Raday worked at the Arvada, Aurora and occasionally the Denver clinics and McConnell at the Arvada and Greeley clinics. V.C. ¶ 14. As main point of contact, they were tasked with answering patient questions, calling patients, setting follow-up appointments, and updating patient information in R2's computer systems. Under Dr. Natkin's supervision, Raday and McConnell also distributed medications to patients, including controlled substances such as testosterone, and both also assisted with blood draws for patient lab tests. V.C. ¶ 15.

As part of their duties, Raday and McConnell had access to two separate computer programs that R2 utilizes in its business – Simple Practice and HubSpot. V.C. ¶ 15. R2 uses Simple Practice for electronic management and storage of patients' medical information, including lab data, charts, medical notes, information regarding patient medications, as well as a full demographic information on each patient. V.C. ¶ 15. R2 also uses the digital platform HubSpot, a client retention management system used in marketing, tracking e-mail messages, tracking conversations between staff, assigning tasks to one another, and distribution of treatment plans that are emailed to the patient. V.C. ¶ 15. R2 ensures the information contained in the two (2) systems is confidential due to the value R2 places on the information contained therein because it

6

is not publicly known information, and the patient information is protected health information. V.C. ¶ 16.

R2 followed a regular procedure when its patients would come into the clinic for an appointment or to pick up medication – prior to the patients' departure, the patient would interact with the employee (generally Raday and McConnell in the Arvada and Greeley clinics) to set up follow-up appointments, usually for the next month to review lab results, conduct blood tests, pick up medication or discuss treatment plans. V.C. ¶ 19. Throughout 2021, Defendants Raday and McConnell (along with other employees), would use HubSpot or Simple Practice to set these routine patient appointments for the next month. V.C. ¶ 20, 21.

During the month of March 2022, Defendants Raday and McConnell failed to follow R2's regular policy and procedure by not setting up follow-up appointments for the month of April 2022. V.C. ¶ 23. In late March, Dr. Natkin reviewed the clinic calendars for the Arvada and Greeley locations and found there to be no or very few future appointments set for April 2022. This was purposefully done so Defendants Raday and McConnell could take R2's patients with them to their new clinic with Lann, DSR, and/or Does 1 through 10. V.C. ¶ 23.

On March 29, 2022, Raday requested a meeting with Dr. Natkin. Dr. Natkin was not aware of the nature of the meeting and was surprised when Raday and McConnell tendered their resignations from R2 on April 1, 2022. V.C. ¶ 25. Raday explained that he was leaving the clinic in order to help his father and family friend open a separate clinic. McConnell explained she was leaving was to assist Raday in opening the new clinic. Raday's last day that he performed work with R2 was on April 1, 2022 and McConnell's last day at R2 was on April 8, 2022. V.C. ¶ 26, 27.

Dr. Natkin and his staff contacted patients to set up follow-up appointments in April 2022 that should have already been scheduled in March 2022 (by Raday and McConnell) when he learned from one patient that he would be leaving R2 for Raday's new clinic. Other patients were evasive or ambivalent about setting up future appointments. V.C. ¶ 28. When another patient failed to show up at R2 for a scheduled appointment, it was determined that Lann had prescribed the same medication she was prescribed while at R2 a few days after failure to appear for her follow up appointment. V.C. ¶ 29.

As the main point of contact for many of R2's patients, Raday and McConnell knew information about much of R2's patients' medical regimens, medical history, contact information, appointments, and treatment plans, and knew how to access and confiscate that data, and upon information and belief, were able to use that information easily pull R2 patients to the new clinic with Lann, DSR, and Does 1 through 10. V.C. ¶ 30. Raday and McConnell exceeded their authorized use of HubSpot and Simple Practice when they obtained this information and took it without authorization to Lann, DSR and/or Does 1 through 10. V.C. ¶ 31.

As stated above, R2 has clinics in Greeley and Arvada. Raday personally guaranteed the lease for Arvada and Raday and McConnell for Greeley. V.C. ¶ 14. Raday requested R2 to vacate the Arvada clinic by April 4, 2022 during the April 1, 2022 meeting. Dr. Natkin advised this was impossible due to him needing time to relocate and move all the equipment. V.C. ¶ 32.

McConnell advised Dr. Natkin that he would need to vacate the Greeley location by April 4, 2022. She eventually agreed to allow R2 to remain in the Greeley clinic through the end of April. V.C. ¶ 33. However, McConnell refused to give Dr. Natkin access to the Greeley clinic, stating that Dr. Natkin would have to get landlord permission to get the main building key and

8

alarm code to the outside door of the facility. The landlord refuses to give Dr. Natkin access, deferring to McConnell and Raday who signed the lease. Neither McConnell nor Raday have provided R2 with the key and alarm code to access the Greeley clinic. V.C. ¶ 32. This has obviously hampered R2's ability to conduct patient appointments, pick up medications, and to monitor the controlled substances stored at that location (namely, testosterone). V.C. ¶ 34.

R2 was able to contact six (6) patients to re-schedule their appointments in the Greeley clinic but had to cancel those appointments because R2 had no access to the Greeley clinic as McConnell "locked" R2 out. V.C. ¶ 33. McConnell's refusal to allow R2 full and complete access to the Greeley clinic has damaged R2's good will with its patients by making it seem like R2 simply closed its doors without notifying its patients. Even if patients show up to the Greeley Clinic, R2 cannot get into the clinic to treat them because McConnell has locked the clinic, and it essentially appears as if R2 is no longer operating its Greeley clinic. V.C. ¶ 35.

## IV.   LEGAL STANDARD

### 1. Temporary Restraining Order

Temporary restraining orders issue to "prevent future harmful conduct." *Reconstruction Experts Inc. v. Franks*, 2018 WL 1973177, 4 (D. Colo. Feb. 23, 2018). TROs are sought where a party seeks to preserve the status quo and prevent irreparable harm for a period long enough to hold a hearing. *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974). The Tenth Circuit justifies TROs where there exists a probable right and a probable danger, and due to the extraordinary nature of a preliminary injunction, the right to relief must be clear and unequivocal. *Crowther v. Seaborg*, 415 F.2d 437, 439 (10th Cir.

1969); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1154 (10th Cir. 2001).

To establish a TRO, R2 must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm will ensue if the request is denied; (3) the threatened injury outweighs the harm that the TRO may cause defendant; and (4) if issued, the TRO will not adversely affect the public interest. *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)(citing *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1255 (10th Cir. 2003)); . s*ee also, Briscoe v. Sebelius*, 927 F.Supp.2d 1109, 1114 (D. Colo. 2013)(holding that the requirements for issuing a TRO are the same for issuing a PI).

## V.   ARGUMENT

1. **R2 has a Substantial Likelihood of Prevailing on the Merits of its Claims Against Defendant(s) for (1) Violation of the Stored Communications Act; (2) Violation of the Defend Trade Secrets Act; (3) Violation of the Colorado Uniform Trade Secrets Act; (4) Civil Conspiracy to Misappropriate Trade Secrets; and (5) Tortious Interference with Contract and Business Expectancy**

   a. *Defendants violated the Stored Communications Act and R2 will likely prevail on the merits of its claim.*

The Stored Communications Act ("SCA") provides a civil cause of action against anyone who "(1) intentionally accesses without authorization a facility through which an electronic communication service is provided; or (2) intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents authorized access to a wire or electronic communication while it is in electronic storage." 18 U.S.C. § 2701; § 2707 (providing for civil

cause of action). Under the statute, "electronic communication" includes, among other things, the transfer of writing, images, or data. 18 U.S.C. § 2510(12).[3]

R2 Medical uses two software systems for conducting business, as outlined in its Verified Complaint – HubSpot and Simple Practice, which are electronic communication service facilities. Despite Raday and McConnell having access to these computer systems when they worked for R2, R2 never authorized them to use R2's software systems to access confidential patient medical information and in turn, use that information to the advantage of DSR, Lann, and Does 1 through 10 by taking R2's patients based upon R2's medical treatment plans. Defendants intentionally exceeded their authorization to access HubSpot and Simple Practice while still working with R2.

Further, R2 has a reasonable probability of success on the merits of this claim due to a clear violation of the Stored Communications Act as supported by the egregious nature of Raday and McConnell's departure from R2 and the weeks leading up to that, where they intentionally did not schedule follow-up appointments for R2 patients, treated some patients using R2's medical treatment plan, and scheduled R2's patients to treat with DSR, Lann, and Does 1 through 10.

  b. *<u>Defendants violated the Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act and R2 will likely prevail on its claim</u>*

Under the Defend Trade Secrets Act, information is considered a "trade secret" if:

---

[3] "electronic storage" means (1) "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof," or (2) "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

1) the information is actually secret because it is not generally known to or readily ascertainable through proper means by another person who can obtain economic value form the disclosure or use of the information;
2) the owner thereof has taken reasonable measures to keep such information secret; and
3) the information derives independent economic value, actual or potential, from being secret.

18 U.S.C. § 1839(3).

R2 stores patient information in HubSpot and Simple Practice. This information was only accessible to R2 Employees including contracted workers, Raday and McConnell, whose duties were to access the systems to set patient appointments. R2's confidential patient medical information was not accessible to the public and R2 takes steps to limit access to the information by only allowing access to certain individuals with a need to know and they are able to success the systems through their passwords. V.C. ¶ 15. R2 took appropriate measures to protect access to those systems by limiting its users to those who were carrying out daily functions of the business.

R2 relies heavily on HubSpot and Simple Practice to carry out the daily functions of its business, including identifying and tracking patient's appointments, treatment plans, prescribed medications and various other private patient information.

The information that Raday and McConnell took with them from R2 to DSR, Lann, and Does 1 through 10 clearly meets the definition of trade secrets as defined in 18 U.S.C. § 1839(3). R2 never authorized Defendants to use R2's trade secrets in this manner.

Defendants unlawfully misappropriated R2's trade secrets under the Colorado Trade Secrets Act when they used and continue to use and benefit from R2's confidential patient information ("CUTSA"). *See* Colo. Rev. Stat. § 7-74-102(2) (defining misappropriation); 18 U.S.C. § 1839(5) (same).

12

Raday and McConnell had access to and stole the trade secrets at issue by accessing R2's patient information through HubSpot and Simple Practice, then in turn took that information with them when they left R2 in April 2022. Raday and McConnell failed to schedule follow-up appointments with R2 patients during the month of March 2022, then contacted those same patients, treated some without medical oversight, and transferred R2's patients to treat with Lann, DSR and/or Does 1 through 10 for the April appointments that should have been set with R2. V.C. ¶ 23.

Raday and McConnell used and continue to use R2's trade secrets to directly undercut R2's business dealings and began doing so prior to ending work with R2, but it continues in the creation of their new venture with DSR, Lann, and Defendants. This conduct is a straightforward violation of DTSA and CUTSA. *See Xantrex*, 2008 WL 2185882, at *19 (misappropriation where defendant reviewed trade secret documents "just prior to leaving" his employer).

   c. *Defendants committed civil conspiracy to misappropriate trade secrets and R2 is likely to prevail on its claim*

In Colorado, a conspiracy requires that "1) two or more persons; 2) come to a meeting of the minds; 3) on an object to be accomplished or a course of action to be followed; 4) one or more overt unlawful acts are performed; and 5) with damages as the proximate result thereof." *Ziegler v. Inabata of Am., Inc.*, 316 F. Supp. 2d 908, 918. (D. Colo. 2004).

The verified complaint outlines the numerous parties involved in this scheme. First, there is more than one Defendant involved in this matter. Second, it is clear to R2 that Raday and McConnell came to a meeting of the minds regarding at the very least their intentions of leaving R2, taking R2's patients and setting up a new clinic. V.C. ¶ 26. Raday and McConnell told Dr. Natkin at their meeting on April 1, 2022, their plans to work together upon their departure.  In

13

furtherance of the scheme, Raday and McConnell intentionally did not set follow-up appointments in April for R2 patients to see Dr. Natkin but referred or transferred R2's patients to Lann, DSR and/or Does 1 through 10. V.C. ¶ 23.

Raday and McConnell utilize their access to R2's patient management software, HubSpot and Simple Practice, to gather information about R2 patients' medical treatment plans (and used those plans to treat R2 patients consistent with R2's medical records for patients), contact information, prescribed medications, and used that information to treat R2's patients. R2 spoke to at least one patient who confirmed that Lann had prescribed the exact medicine that R2 had prescribed, information that was taken from R2's protected patient database.

### *d. R2 has a substantial likelihood of prevailing on its claim that Defendants committed tortious interference with R2's contract and business expectancy*

A tortious interference with a contract and business expectancy occurs when a defendant acted intentionally and improperly in a manner that induced "one or more of Plaintiff's business relations to not enter or continue business relations with [Plaintiff]." *Bolsa Resources, Inc. v. Martin Resources, Inc.*, No. 11-CV-01293-MSK-KMT, 2014 WL 4882132, *9 (D. Colo. Aug. 28, 2014) citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493 (Colo. 1995). The plaintiff must show that the interference was not only intentional, but also improper. *Id.*

Here, the conduct of Defendants was intentional and improper. In the month before they left R2, Raday and McConnell did not schedule follow-up appointments for the next month as is customary with the treatment of R2 patients. Raday and McConnell knew which patients to contact to set up the appointments with at the new clinic – without ever having to interrupt the patients' course of therapy or treatment. They knew the implications that failing to set follow-up appointments and did so in order to bring R2 patients to the new clinic.

14

Defendant's conduct was also improper. The Second Restatement of Torts provides a list of factors to consider when determining whether conduct is considered improper as it applies to tortious interference with a business expectancy. For example, economic pressure and misrepresentations are both actions that are considered improper. Factors to be considered include:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

Restatement (Second) of Torts § 767 cmt c (1979).

Here, Defendant's actions in failing to schedule follow appointments with R2 patients were deliberate and motivated by a plan to undermine R2's business in favor of DSR, Lann, and/or Does 1 through 10. The motive was clear – when Raday and McConnell knew they would be leaving R2, they used their position to access confidential patient information while setting R2 up for failure by not scheduling future appointments. They even told Dr. Natkin they were going to start a new clinic (but did not mention it would be a clinic that competes with R2),[4] and conveniently, there were plenty of R2 patients to take with them. The nature of Defendants conduct is bold and unapologetic, and their motive to steal clients from R2 has been apparent since the time they failed to schedule the follow-up appointments.

Second, Defendants acted and continue to act in a manner that has ended many of R2's business relations. R2 called on a patient to schedule the April follow-up that Raday and

---

[4] *See* Supra Note ___.

15

McConnell failed schedule, the patient informed R2 they were going to be leaving R2 for Raday, Lann, DSR and/or Does 1 through 10. Defendant's conduct has already ended numerous relationships between R2 and its patients from the lapse in scheduling and the "lock-out" from one of its own clinics. R2 will continue to lose the good will and patient relationships it built if Defendants actions are not enjoined.

> *e. R2 has a substantial likelihood of prevailing on its claim of Accounting and Constructive Trust*

A constructive trust is an equitable remedy imposed whenever wrongdoing, fraud, duress, abuse of confidence, or some other questionable conduct was employed by a party to obtain property. *Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979). Property obtained "by fraud may create a constructive trust which will require disgorgement of the wrongfully acquired property. *Id.* at 798. Citing *Langworthy v. Republic Mutual Ins. Co.*, 103 Colo. 393, 86 P.2d 610 (1939)).

Here, Raday and McConnell stole R2's confidential and proprietary trade secrets through the unauthorized access of R2's business software systems – HubSpot and Simple Practice. Defendants have utilized and continue to utilize R2's trade secrets in order to get R2's patients to establish care with Lann, DSR, and/or Does 1 through 10. The revenue that Defendants have acquired as a direct and proximate result of this fraud should be set aside and restored to R2's possession as supported by the facts contained herein.

**2. R2 will Suffer Irreparable Harm Without Injunctive Relief**

Irreparable harm exists if R2 can show that the Court would not be able to grant an effective monetary remedy for the injury caused by Defendant's conduct. *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.2d 1149, 1156 (10th Cir. 2001). Threats to trade or business

viability can constitute irreparable harm. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.*, 805 F.2d 351, 356 (10th Cir. 1986). Other jurisdictions have also noted the possibility of going out of business can constitute irreparable harm and even the loss of customers or loss of goodwill. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 28–29 (2d Cir.1978); *Int'l Snowmobile Mfrs. Ass'n. v. Norton*, 304 F. Supp. 2d 1278, 1287 (D. Wyo. 2004).

There is no monetary remedy that can compensate R2 for the damages caused by Defendant. R2 has been fostering its' patient relationships at four separate locations over the past year to grow R2's goodwill and good name; and that is now in jeopardy from the actions of Defendant. R2's patients will continue to leave for Lann, DSR and Defendants because Defendants are misusing R2's confidential patient information and R2 is still locked out of its' Greeley clinic and cannot treat its patients there. Patients put much trust in their medical providers because the relationship between patient and provider is an extremely private and personal affair. Defendant's conduct has already undermined that trust and will continue to do so without any recourse. Furthermore, unauthorized transfer of patient records to another doctor without approval or consultation with Dr. Natkin clearly puts the patient's health at risk.

### 3. The Threatened Injury to R2 Outweighs the Harm that the TRO may Cause Defendant(s)

As shown above, if a TRO and PI are not issued, a decision on the merits at some later point in time will be too late and the threats to the viability of R2's business will more likely materialize – R2 will continue to lose patients to DSR, Lann, and Does 1 through 10. The status quo must be preserved until the Court can properly review the facts and law and come to a

reasoned conclusion. No harm will be done to Defendant's if injunctive relief is ordered because Defendants can still run their business, the TRO would only purohit Defendants from misusing R2's confidential patient information to contact and treat R2's patients.  Defendants may also continue to service their own patients as well.

### 4. The TRO will not Adversely Affect the Public Interest if Granted

The burden is on R2 to show that the injunction, if issued, is not adverse to the public interest. *Kikumura v.* Hurley, 242 F.3d 950, 955 (10th Cir. 2001).  A TRO would ensure R2's patients' confidential medical information is not in the hands of someone without authority or permission to obtain that information. R2's patients will be comforted to know that they can continue their course of treatment as prescribed by Dr. Natkin – not as prescribed for by Defendants. The public interest also benefits from granting a TRO by assuring the thousands of business owners in this District that there are consequences when someone working at the business decides to misappropriate trade secrets and use those misappropriated trade secrets in forming a competing business by unfairly taking away another's business. A TRO would avert future bad actors from committing similar acts of conduct.

As stated in the Verified Complaint, R2 has not been able to gain access to its Greeley location since early April 2022. V.C. ¶ 29. Without access to that location, Dr. Natkin has been unable to schedule and conduct regular appointments at that location, pick-up medication from that location, and monitor the testosterone (which is a controlled substance) that is stored at that clinic all resulting in harm to R2's patients. Without continued and ongoing treatment, R2's clients are having to interrupt their treatment schedules to the detriment of their health or go somewhere else for treatment and start all over, which arguably was Defendants' intentions.

For all the reasons stated above, it is clear to undersigned counsel that the public interest will not be harmed without any judicial intervention.

**No Bond Should Be Required**

R2 is asking for the return of its own property and to restrain Defendants from misusing its property. There are no damages that would be incurred by Defendants in this scenario[5]—the only damages are the continuing damages to R2 by Defendants and R2 requests that the Court grant the TRO without security. To the extent the Court requires security for the TRO, R2 requests that the Court order security in the amount of $100.00.[6]

## VI. CONCLUSION

WHEREFORE, Plaintiff R2 Medical Clinic, P.C. respectfully requests that the Court enter judgment in its favor and against Defendants Raday, McConnell, Lann, DSR, Optimization Clinics, LLC, and Does 1 through 10 on Plaintiff's claims as follows:

A. Grant a Temporary Restraining Order against Defendants as follows:

1. Require Defendants to immediately provide R2 access to the Greeley Colorado clinic;

2. Require Defendants to immediately return all of R2's confidential patient information, including but not limited to patient contact information, medical reports, treatment plans, lab tests and any other information they

---

[5] Under Rule 65(c), a court may issue a preliminary injunction or a temporary restraining order "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The issuance of a security or bond to account for damages sustained by the party enjoined is subject to the discretion of the trial court. *Roth v. Bank of the Commonwealth*, 583 F.2d 572, 539 (6th Cir. 1978).

[6] Although Rule 65© requires security given before issuing a TRO, the security is based upon the court's discretion and given Defendant's actions, R2 believes no security is needed in this case.

stole from R2's computer systems, whether in electronic or hard copy format;

3. Prohibit Defendants from using R2's confidential patient information to contact and/or treat any R2 patient;

4. Require Defendants to provide a list of all R2 patients they contacted since March 15, 2022 to the date of the Temporary Restraining Order; and

5. Require Defendants to account for all income they received and/or billed to R2 patients who were treated since April 1, 2022, to the date of the Temporary Restraining Order and hold that money in a constructive trust bank account until this matter can be heard by the Court.

Dated this 25th day of April, 2022.

CAMPBELL LITIGATION, P.C.

By: /s/*Stacey A. Campbell*
Stacey A. Campbell
Shana D. Velez
1410 N. High Street
Denver, Colorado 80218
Tel: (303) 536-1833
Email: stacey@campbell-litigation.com
shana@campbell-litigation.com